■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v KAREEM Y. HAYES, Appellant. [874 NYS2d 324]—

Kavanagh, J. Appeal from a judgment of the County Court of Schenectady County (Hoye, J.), rendered January 25, 2007, convicting defendant upon his plea of guilty of the crimes of murder in the second degree (two counts) and burglary in the second degree (two counts).

On January 16, 2006, the mutilated remains of Hillary Downey (hereinafter the victim) and her 13-month-old son were discovered by police in her apartment in the City of Schenectady, Schenectady County. The victim had been strangled and stabbed 33 times in the neck and chest while her son sustained multiple stab wounds to the chest and heart. Defendant was subsequently charged by indictment with their murders and the burglary of the victim's apartment. He was also charged with the commission of two other burglaries—one that had occurred at the victim's apartment two weeks earlier on January 1, 2006 and an unrelated residential burglary that occurred on January 3, 2006.[1] After defendant's motion to suppress incriminating statements he made was denied, he pleaded guilty to two counts each of murder in the second degree and burglary in the second

---

1. The 13-count indictment charged defendant with three counts of murder in the first degree, two counts of murder in the second degree, three

degree and was subsequently sentenced as a second felony offender to an aggregate term of imprisonment of 50 years to life.[2] He now appeals, claiming that statements he made to the police were obtained after he had been illegally detained and should have been suppressed. Defendant also argues that the sentence he received was unduly harsh and excessive and should, in the interest of justice, be reduced. For reasons that follow, we reject each of these claims and now affirm.

The relevant facts as they relate to the decision by the police to detain defendant and place him under arrest are not in dispute. On the morning of January 16, 2006, Police Officers Marisela Mosher and Michael Crounse were dispatched to the victim's residence as the result of a phone call received by the Schenectady Police Department from her boyfriend to the effect that he had not been able to contact the victim for several days and feared for her safety.[3] Two weeks earlier, Mosher had been to the same apartment to investigate a complaint by the victim that her apartment had been burglarized and some of her belongings had been stolen. Mosher recalled that the victim, who lived alone in the apartment with her infant son, had at that time identified defendant as the person she believed to have committed the burglary.

When Mosher and her partner arrived at the apartment, they received no response to their knocks and calls at the door. They found that all of the doors to the apartment were locked and, during a check of the exterior of the premises, found no sign of forced entry. Mosher did note the presence of fresh footprints in the snow leading to a window on the side of the apartment. Prior to returning to police headquarters, Mosher had the department dispatcher place a telephone call to the victim's home phone number. Not only was there no answer, but the dispatcher reported not being able to leave a message on the answering machine because it was full.

Later that same day, unaware that the police had been to the premises, the victim's brother and stepfather went to the apartment to look for her because they had not heard from her in several days and were concerned for her welfare. After receiving no response from inside the apartment, both men decided to force their way into the apartment through a side window. As

counts of burglary in the second degree, four counts of petit larceny and one count of criminal mischief in the fourth degree.

2.    One of the burglary counts to which defendant pleaded guilty involved the unrelated incident that occurred on January 3, 2006 and is not challenged on this appeal.

3.    The caller, Sanjulo Taylor, was incarcerated in the Albany County Jail.

they sought to pry open the window, they were suddenly confronted by an unknown man who came to the window from inside the apartment. When this individual refused to come outside the apartment or allow the victim's relatives to enter, both men went to police headquarters for assistance. After filing a complaint, the victim's relatives were instructed by the police to return to her residence to await the arrival of a patrol car.

Mosher and her partner were again dispatched to the victim's apartment after having been notified that the victim's relatives had just reported seeing the man leave the apartment carrying two suitcases. A description was given of the man and his approximate location. Moments later, Mosher saw defendant walking with two suitcases a short distance from the victim's apartment. Mosher noted that defendant fit the description of the man seen leaving the apartment and recognized him as the individual the victim had suspected of burglarizing her apartment two weeks earlier.

As Mosher approached defendant, the victim's relatives arrived on the scene, got out of their vehicle and attempted to talk with defendant. The officers first stopped the victim's relatives from approaching defendant and then asked defendant for identification, as well as an explanation as to why he was in the victim's apartment. Mosher noted that despite the frigid temperatures, defendant was "sweating really badly." In response to Mosher's questions, defendant stated that he was coming from his girlfriend's apartment and that she was at a local shopping mall. Mosher then told defendant that no one had heard from the victim or had seen her or her child for several days and that he had been previously identified by the victim as a suspect in a burglary of her apartment. Mosher informed defendant that he would be required to return with the police to the victim's apartment and that if he refused, he would be charged with "obstruction." Defendant, prior to being placed in the police car, was searched and a large knife was recovered from his pants. He was not handcuffed or otherwise restrained.

Once inside the patrol car, defendant abruptly told Mosher that she should take him directly to jail. When Mosher asked, "Why, what's wrong, tell me?", defendant stated, "She's dead!" En route to the victim's apartment, Mosher radioed for emergency medical assistance and asked defendant about the condition of the infant. In response, defendant simply replied, "Dead." When they arrived at the premises, Mosher used a key—given to her by defendant—to gain entry to the apartment and, at that time, discovered the remains of both victims. De-

fendant was brought to police headquarters where he was advised of his *Miranda* rights and gave two statements that were reduced to writing, in which he confessed to the murder of the victim and her son.

Defendant concedes that the police were initially justified in stopping him and asking him for identification, but claims they did not, on the facts presented, have the right to inquire further because "a founded suspicion that criminal activity is afoot" did not exist (*People v De Bour*, 40 NY2d 210, 223 [1976]). He claims that compelling him to enter the patrol car constituted an illegal restraint on his liberty, and that any statements subsequently attributed to him by the police were the product of that illegal detention and should have been suppressed. We disagree.

When Mosher first confronted defendant, she not only recognized him as the man the victim believed had previously burglarized her apartment, but also knew that only moments earlier, defendant had been seen leaving the victim's apartment with two suitcases. The police were also aware that defendant had been seen earlier that day inside the victim's apartment by her relatives and had refused to allow them to enter. Moreover, defendant's own erratic and somewhat bizarre behavior when first confronted by the police and his claim that the victim was his "girlfriend," simply served to reinforce Mosher's suspicion that criminality was afoot (*see People v De Bour*, 40 NY2d at 223) and that a serious crime had been committed (*see People v Lee*, 6 AD3d 751, 753 [2004]; *People v Shakur*, 233 AD2d 793, 795 [1996], *lv denied* 89 NY2d 1041 [1997]). Taken as an integrated whole, these facts undeniably establish that when Mosher decided to detain defendant, she had probable cause to believe that he had committed a burglary of the victim's apartment and was fleeing the scene when stopped by the police (*see e.g. People v Hicks*, 68 NY2d 234, 238 [1986]; *People v Tillman*, 57 AD3d 1021, 1022-1023 [2008]; *People v McNair*, 36 AD3d 1073, 1075 [2007], *lv denied* 9 NY3d 847 [2007]; *People v Lewis*, 287 AD2d 888, 889 [2001], *lv denied* 97 NY2d 684 [2001]). As such, the decision to detain defendant and take him into custody had a lawful basis and his motion to suppress the statements he subsequently made on the ground that they were the product of an illegal detention was properly denied.

Further, we disagree that any statements made by defendant while in the patrol car should been suppressed because he had not been given his *Miranda* warnings. Viewed in their proper context, the only questions put to defendant while in the patrol car were investigatory in nature and came in response to his spontaneous declaration that he should be taken to jail. Each

question was part of Mosher's ongoing effort to make an accurate assessment of what appeared to be an emergent situation and, as posed, each question was obviously designed to aid her in fashioning an appropriate response (*see People v Huffman*, 41 NY2d 29, 34 [1976]). Given these circumstances, *Miranda* warnings were not, at that time, required (*see People v Naradzay*, 11 NY3d 460, 468 [2008]; *People v Brown*, 23 AD3d 1090, 1092 [2005], *lv denied* 6 NY3d 810 [2006]; *People v Madore*, 289 AD2d 986, 986 [2001], *lv denied* 97 NY2d 757 [2002]; *People v Tunstall*, 278 AD2d 585, 587 [2000], *lv denied* 96 NY2d 788 [2001]; *People v Burnett*, 228 AD2d 788, 790-791 [1996]; *People v Green*, 161 AD2d 359, 360 [1990], *lv denied* 76 NY2d 857 [1990]).

After defendant was placed under arrest, he was taken to police headquarters where he was properly advised of his constitutional rights. After he agreed to waive these rights, defendant voluntarily provided written statements describing the circumstances surrounding the murder of the victims. As such, defendant's motion to suppress was properly denied.

Finally, the sentences imposed were clearly in proportion to the heinous nature of the crimes for which defendant stands convicted and were not, by any fair measure, either harsh or excessive (*see People v Weiskopff*, 20 AD3d 776, 776 [2005]; *People v Haynes*, 14 AD3d 789, 791 [2005], *lv denied* 4 NY3d 831 [2005]; *People v Washington*, 4 AD3d 546, 548-549 [2004]).

Peters, J.P., Lahtinen and Stein, JJ., concur. Ordered that the judgment is affirmed.

