Peters, P.J.
 

 Appeal from a judgment of the County Court of Broome County (Smith, J.), rendered January 2, 2015, upon a verdict convicting defendant of the crimes of robbery in the first degree, murder in the second degree (two counts) and murder in the first degree.
 

 On the afternoon of July 8, 2013, the bludgeoned body of Patricia LaCaprara was found on the kitchen floor of her first floor apartment located at 36 Brown Street in the Village of Johnson City, Broome County. The apartment was in a state of. disarray, with dresser drawers opened and ransacked, the mattress pushed off of its box spring and items of personal property broken or strewn across the floor. The victim had sustained various wounds throughout her body, including multiple fractures to her facial bones and skull, stab wounds to her face and neck and over a dozen rib fractures, and forensic evidence indicated that she had died as a result of multiple blunt traumatic injuries to her head.
 

 Defendant, the victim’s upstairs neighbor, was subsequently arrested and charged by indictment with murder in the first degree, two counts of murder in the second degree and robbery in the first degree. He moved to suppress incriminating statements he made to police and, after a hearing, County Court denied the motion. A jury trial ensued, at the conclusion of which defendant was found guilty on all counts. County Court thereafter imposed concurrent prison terms of life without the possibility of parole for the conviction of murder in the first degree, 25 years to life for each of the murder in the second degree convictions and 25 years for the robbery conviction. Defendant appeals.
 

 Defendant claims that statements he made to police following his arrest should have been suppressed as the product of an earlier unlawful detention and warrantless search of his vehicle. The relevant facts as they relate to this issue are not in dispute. Approximately two hours before the victim’s body was discovered, Richard Merrell, a deputy with the Broome County Sheriffs Office, was dispatched to an area known as Aqua Terra Park in response to a parking complaint. While Merrell was running the licence plates of the two cars parked there, which included a white Toyota Camry, defendant emerged from an area of thick brush waving his hands and walking very quickly towards Merrell. Unable to discern what was wrong, Merrell left his vehicle and approached defendant. Defendant—who was wearing a tank top, shorts and flip flops and was muddy and wet—informed Merrell that he had fallen and dropped his wallet and keys in the area from where he had emerged. When asked what he was doing in the area, defendant responded that he was looking for a fishing spot. In response to further questioning, defendant indicated that the Camry had been rented by his daughter, who was staying at the Comfort Inn Suites in the Town of Vestal, Broome County. Merrell left defendant in the parking area and proceeded to investigate the area from which defendant had emerged. Merrell located a path leading to the bank of a pond, where he encountered a second male who identified himself as defendant’s nephew. After this individual’s explanation for their presence in the area did not comport with that given by defendant, Merrell asked him to empty his pockets. From his pockets, this individual produced a set of car keys and a pack of cigarettes that contained a marihuana “roach.” Merrell also noticed a second set of clothing in the area where the male was sitting, which Merrell had him gather up before the two returned to the parking area.
 

 Upon returning to parking area, Merrell asked for and obtained defendant’s consent to search the vehicle. During the ensuing search, Merrell discovered, among other things, a ball-peen hammer, a woman’s wallet and change purse, and a driver’s license and shopping card bearing the name of Patricia LaCaprara. When Merrell asked who Patricia LaCaprara was, defendant responded that he did not know and reiterated that his daughter had rented the car. Merrell did not seize any of the items that he discovered and, after directing the male to discard the marihuana roach, sent the two men on their way.
 

 After leaving the scene, Merrell attempted to verify the information that he had received and learned that the male he had located by the pond falsely identified himself, that his true name was Zachary Franks and that there was an active warrant out for his arrest. When Merrell proceeded to the home addresses that had been provided by defendant and Franks, both proved to be false. Merrell then traveled to the Comfort Inn Suites at which defendant had indicated his daughter was staying, where he learned that she had just checked out with two men matching the descriptions of defendant and Franks and that she had provided an address of 36 Brown Street. Upon arriving at that address, Merrell observed numerous police vehicles in the vicinity and, after speaking with the supervising detective, learned for the first time that the victim had been murdered at that location earlier in the day. Merrell relayed his interactions with defendant and Franks to the investigating officers and, several hours later, police apprehended and arrested defendant. While being transported to the police department to be interviewed, defendant stated, “I was going to turn myself in. I was going to come down and talk to you.” When one of the officers in the vehicle asked defendant what he meant, defendant responded, “[M]y nephew . . . [was] saying I did some bad things.” Once at the station, defendant was advised of his Miranda rights and ultimately invoked his right to counsel.
 

 Merrell’s initial questioning of defendant was justified and is not challenged. Defendant’s emergence from a dense, swampy area of the park and his erratic behavior and somewhat bizarre appearance provided an objective, credible reason for Merrell to ask general questions concerning defendant’s identity, address and the purpose of his presence in the area and to request that he stand by momentarily while he investigated the situation (see People v Hollman, 79 NY2d 181, 190 [1992]; People v Pirillo, 78 AD3d 1424, 1426 [2010]; People v Leiva, 33 AD3d 1021, 1022 [2006]; People v Moyaho, 12 AD3d 692, 693 [2004], lv denied 4 NY3d 766 [2005]; People v Wright, 8 AD3d 304, 306 [2004]). The inconsistent explanations given by defendant and Franks regarding their presence at the location, the fact that Franks had in his possession the car keys that defendant claimed to have just dropped in the swampy area and the discovery of marihuana in Franks’ possession gave rise to a founded suspicion that criminality was afoot (see People v Smith, 137 AD3d 442, 442-443 [2016], lv denied 27 NY3d 1139 [2016]; People v Brown, 308 AD2d 398, 398 [2003], lvs denied 1 NY3d 625, 595 [2004]). Given that founded suspicion, Merrell was authorized to inquire whether there were any additional drugs in the vehicle (see People v Cavanagh, 97 AD3d 980, 981 [2012], lv denied 19 NY3d 1101 [2012]; People v Lowe, 79 AD3d 1676, 1677 [2010], lv denied 16 NY3d 833 [2011]) and to ask defendant for his consent to search it (see People v Dunbar, 5 NY3d 834, 835 [2005]; People v Hollman, 79 NY2d at 191-192; People v Whalen, 101 AD3d 1167, 1168 [2012], lv denied 20 NY3d 1105 [2013]).
 

 Contrary to defendant’s claims, Merrell’s conduct during the course of the inquiry did not elevate the encounter to a seizure requiring reasonable suspicion (see generally People v Bora, 83 NY2d 531, 535-536 [1994]; People v De Bour, 40 NY2d 210, 216 [1976]). It was defendant, not the police, that initiated the encounter, the atmosphere was noncoercive, the questioning was investigatory rather than accusatory, there was no display of force and neither defendant nor Franks were physically restrained at any point. Indeed, after the justification for searching the vehicle was exhausted, Merrell sent both defendant and Franks on their way. On this record, we cannot conclude that “a reasonable person would have believed, under the circumstances, that the officer’s conduct was a significant limitation on his or her freedom” (People v Ocasio, 85 NY2d 982, 984 [1995]; see People v Wojes, 306 AD2d 754, 756 [2003], lv denied 100 NY2d 600 [2003]).
 

 Hours later, the officers investigating the robbery and murder were briefed as to Merrell’s interactions with defendant earlier that day. The pertinent facts and circumstances known to the police, taken as an integrated whole, were sufficient to support a reasonable belief that defendant had committed a crime and therefore provided probable cause to arrest him (see People v Hayes, 60 AD3d 1097, 1099-1100 [2009], lv denied 12 NY3d 925 [2009]; People v Tillman, 57 AD3d 1021, 1022-1023 [2008]; People v Lewis, 287 AD2d 888, 889 [2001], lvs denied 97 NY2d 684 [2001], 97 NY2d 756 [2002]). With regard to the statements made by defendant while in the patrol car, testimony at the suppression hearing supports County Court’s determination that defendant’s initial outburst was spontaneous and not in response to any interrogation (see People v Rabideau, 82 AD3d 1283, 1284 [2011], lv denied 17 NY3d 799 [2011]; People v Scott, 47 AD3d 1016, 1019-1020 [2008], lv denied 10 NY3d 870 [2008]; People v Porter, 35 AD3d 907, 908 [2006], lv denied 8 NY3d 926 [2007]; People v Smith, 21 AD3d 587, 588 [2005], lv denied 5 NY3d 833 [2005]). The officer’s ensuing inquiry as to what defendant meant “was merely intended to clarify . . . defendant’s spontaneous statement which immediately preceded it, and did not constitute a custodial interrogation” (People v Grant, 96 AD3d 779, 780 [2012], lv denied 19 NY3d 1026 [2012]; see People v Hayes, 60 AD3d at 1100-1101; People v Taylor, 57 AD3d 327, 328 [2008], lv denied 12 NY3d 860 [2009]). Accordingly, County Court properly denied defendant’s motion to suppress the challenged statements.
 

 Defendant also asserts that his convictions are against the weight of the evidence, arguing that there is insufficient credible evidence to identify him as the perpetrator. Defendant’s identity as the victim’s assailant was established by the testimony of Franks, who provided a detailed account of his interactions with defendant on July 8, 2013 consistent with surveillance video footage and the forensic evidence introduced by the People. Franks testified that, at approximately 10:00 a.m. that morning, defendant arrived at his residence, awakened him and said he had something to tell him. He explained that the two then left his home in a white Camry and that, while in the vehicle, defendant confessed to having inflicted injuries upon his downstairs neighbor with a dumbbell and a box cutter during the course of robbing her apartment that morning. Franks noted that defendant took off his shoes and socks and threw them out of the window before arriving at Aqua Terra Park and indicated that, after their encounter with Merrell, the two drove to a Hess gas station where they disposed of various items in a dumpster. According to Franks, he and defendant then returned to his residence, where they both took showers and changed their clothing, and defendant disposed of the clothing he had been wearing in the trash receptacle across the street.
 

 In addition to Franks’ testimony, the People adduced proof that indicated that defendant was having financial difficulties and established his opportunity to commit the crimes. To that end, the landlord of the building at which the victim and defendant resided explained that she received a call from defendant during the early morning of July 8, 2013, during which defendant indicated that he needed to vacate the premises and that he would remove his belongings by the end of the day, but that he did not have the money to cover the rent due for the month. The landlord thereafter spoke to the victim through text messages and telephone calls, with the last such communication occurring at approximately 8:30 a.m. Surveillance video footage captured defendant—who was wearing an orange tank top—leaving the vicinity of Franks’ residence alone at approximately 9:00 a.m. that morning and then returning there around 9:50 a.m., and phone records place defendant in the vicinity of the crime scene during that time. Video footage also corroborated Franks’ account as to the pair’s travels that afternoon and captured defendant disposing of items at the various locations testified to by Franks. Upon a search of the gas station dumpster and the swampy area of Aqua Terra Park from where defendant had emerged earlier that day, police discovered a box cutter, jewelry, a purse and various items belonging to the victim. At the curb across the street from Franks’ residence, police discovered a plastic bag containing a muddied pair of shorts and an orange tank top. DNA testing of the blood stains found on each of these items of clothing, as well as that found on a white sock recovered from a roadway in the vicinity of Aqua Terra Park, was consistent with the victim’s DNA.
 

 In attempting to assail the verdict, defendant vehemently attacks the credibility of Franks, stressing Franks’ incentive to implicate him in these brutal crimes and noting the absence of any DNA evidence placing him inside the victim’s apartment at the time of their commission. These issues, however, were fully explored at trial and properly presented to the jury for its consideration (see People v Ramos, 129 AD3d 1205, 1206 [2015], lv denied 26 NY3d 971 [2015]; People v Gibson, 121 AD3d 1416, 1418 [2014], lv denied 24 NY3d 1119 [2015]; People v Mercado, 113 AD3d 930, 932 [2014], lv denied 23 NY3d 1040 [2014]), and we discern nothing in the testimony and evidence presented that would render Franks’ testimony incredible as a matter of law (see People v Gordon, 101 AD3d 1473, 1477 [2012]; People v Lopez-Aguilar, 64 AD3d 1037, 1038 [2009], lv dismissed 13 NY3d 940 [2010]; People v Mitchell, 57 AD3d 1308, 1309 [2008]; People v Toland, 2 AD3d 1053, 1055 [2003], lv denied 2 NY3d 808 [2004]). Upon independently weighing the evidence and considering it in a neutral light, while giving due deference to the jury’s credibility determinations (see People v Danielson, 9 NY3d 342, 348-349 [2007]; People v Romero, 7 NY3d 633, 643 [2006]), we find the verdict to be amply supported by the weight of the evidence (see People v Novak, 148 AD3d 1352, 1356-1357 [2017], lv denied 29 NY3d 1084 [2017]; People v Cherry, 46 AD3d 1234, 1236-1237 [2007], lv denied 10 NY3d 839 [2008]).
 

 Defendant’s claim of ineffective assistance of counsel, premised solely on counsel’s failure to call a certain witness to testify at trial, is lacking in merit. The record reflects that counsel had a legitimate reason for not producing this witness and, when viewed in totality, we conclude that defendant received meaningful representation (see People v Knapp, 138 AD3d 1157, 1159 [2016]; People v Wheeler, 124 AD3d 1136, 1139 [2015], lv denied 25 NY3d 993 [2015]).
 

 Finally, although not raised by either party, modification of the judgment is required. “With respect to inclusory concurrent counts, ... [a] verdict of guilty upon the greatest count submitted is deemed a dismissal of every lesser count submitted” (CPL 300.40 [3] [b]). The two counts of murder in the second degree upon which defendant was convicted are inclusory concurrent counts of the count of murder in the first degree upon which he was also convicted (see People v Miller, 6 NY3d 295, 303 [2006]; People v Jeremiah, 147 AD3d 1199, 1206 [2017], lv denied 29 NY3d 1033 [2017]; People v Cherry, 46 AD3d at 1238). Consequently, defendant’s convictions of murder in the second degree must be reversed and the respective counts of the indictment dismissed.
 

 Garry, Devine, Clark and Aarons, JJ., concur.
 

 Ordered that the judgment is modified, on the law, by reversing defendant’s convictions of murder in the second degree under counts 2 and 3 of the indictment; said counts dismissed and the sentences imposed thereon vacated; and, as so modified, affirmed.