People v Martinez (2018 NY Slip Op 07974)





People v Martinez


2018 NY Slip Op 07974


Decided on November 21, 2018


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: November 21, 2018

107789

[*1]THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v
EMMANUEL MARTINEZ, Appellant.

Calendar Date: October 10, 2018

Before: Garry, P.J., Lynch, Devine, Aarons and Pritzker, JJ.


Matthew C. Hug, Albany, for appellant.
Robert M. Carney, District Attorney, Schenectady (Peter H. Willis of counsel), for respondent.



MEMORANDUM AND ORDER
Lynch, J.
Appeal from a judgment of the Supreme Court (Coccoma, J.), rendered July 20, 2015 in Schenectady County, upon a verdict convicting defendant of the crimes of murder in the second degree, attempted murder in the second degree, criminal possession of a weapon in the second degree (two counts), reckless endangerment in the first degree, attempted assault in the first degree and endangering the welfare of a child.
At approximately 9:45 p.m. on August 30, 2013, police responded to a shooting at a home in the City of Schenectady, Schenectady County and discovered Luis Gomez with a nonfatal gunshot wound to his neck. Gomez's brother, Jose Torres, was discovered on the front lawn with fatal gunshot wounds to his torso. Defendant was subsequently arrested in Brooklyn and indicted for the crimes of murder in the second degree, attempted murder in the second degree, criminal possession of a weapon in the second degree (two counts), reckless endangerment in the first degree, attempted assault in the first degree and endangering the welfare of a child. Defendant's first jury trial ended in a mistrial. At the retrial, defendant was convicted as charged and Supreme Court sentenced him to an aggregate prison term of 65 years to life and five years of postrelease supervision. Defendant now appeals.
Defendant contends that the verdict was not legally sufficient and was against the weight of the evidence because the trial evidence did not establish that he was present at the [*2]crime scene. Although defendant did not preserve his legal sufficiency argument because he did not renew his motion to dismiss at the close of his proof (see People v Kolupa, 13 NY3d 786, 787 [2009]), "we necessarily determine whether the elements of the crime[s] were proven beyond a reasonable doubt" as part of our weight of the evidence review (People v Vanderhorst, 117 AD3d 1197, 1198 [2014], lv denied 24 NY3d 1089 [2014]; see People v Danielson, 9 NY3d 342, 348-349 [2007]). When conducting such a review, we must view all the credible evidence in a neutral light and determine, first, that an acquittal would not have been unreasonable and, only if so, "weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Jemmott, 164 AD3d 953, 954-955 [2018] [internal quotation marks and citations omitted]; see People v Bleakley, 69 NY2d 490, 495 [1987]).
At the trial, Gomez, who lived with his wife and three children, testified that defendant had been his neighbor for approximately a year. The evidence established that, while Gomez was incarcerated, his wife engaged in a brief sexual relationship with defendant. On the day that Gomez was released from jail, he confronted defendant about the affair and a street fight occurred during the afternoon involving defendant, Gomez, Torres and several others. The shooting occurred later that evening in Torres' backyard, where Gomez and his family and friends had gathered. Gomez, his wife, his two daughters, his son and one daughter's boyfriend each testified that they knew defendant and identified him as the individual who walked down the driveway leading to Torres' backyard, where he shot Gomez and Torres [FN1]. A taxicab driver testified that he drove defendant to a location near Torres' house on the evening of the shooting. The People also presented evidence that defendant's cell phone "pinged" near Torres' home and showed the jury surveillance video taken on Torres' street the night of the shooting and near the street fight scene the prior afternoon. Kevin Allen, who was in custody with defendant, testified that he knew defendant because defendant had sold him drugs in the past. According to Allen, while the two were in custody, defendant told him that he "blasted" Gomez and Torres.
In addition to presenting witnesses who testified that defendant and Allen never had the occasion to speak with one another while in custody, defendant testified on his own behalf. He detailed the nature of his relationship with Gomez and Gomez's wife and the extent and aftermath of the street fight. According to defendant, after he and Gomez exchanged blows, he returned to the home that he shared with his girlfriend and then, fearing further confrontation, took a cab to Nikkia Michaud's apartment. Defendant testified that Michaud was an ex-girlfriend, he arrived at her apartment shortly after 9:00 p.m., the two watched movies and he remained overnight. At some point during the evening, defendant called his father, and the next morning defendant's mother arrived at Michaud's house and drove defendant back to Brooklyn. Although a different verdict was possible because the jury could have believed defendant's alibi testimony, when we weigh the evidence, view it in a neutral light and defer to the jury's credibility determinations, we find that the verdict was supported by the weight of the evidence (see People v Davis, 155 AD3d 1311, 1315-1317 [2017], lv denied 30 NY3d 1114 [2018]; People v Jackson, 100 AD3d 1258, 1260-1261 [2012], lv denied 21 NY3d 1005 [2013]).
Defendant also argues that Supreme Court abused its discretion by permitting officer Brandon Kietlinski to testify that Gomez identified defendant as the shooter. Although hearsay, "an out-of-court statement is properly admissible under the excited utterance exception when made under the stress of excitement caused by an external event, and not the product of studied reflection and possible fabrication" (People v McCauley, 162 AD3d 1307, 1309 [2018] [internal quotation marks, brackets and citation omitted], lv denied 32 NY3d 939 [2018]). The basis for this exception is that "under certain circumstances of physical shock, . . . [an excited] utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection" and is, therefore, more trustworthy (People v Johnson, 1 NY3d 302, 306 [2003] [internal quotation marks and citations omitted]; see People v Cummings, 31 NY3d 204, 209 [2018]).
Kietlinski testified that he arrived at the scene within minutes after the shooting was reported and rode with Gomez in an ambulance. According to Kietlinski, Gomez was "real upset," "sweating real bad" and "excited, in like a panic state" during the approximately 15-minute ride to the hospital. Kietlinski recalled Gomez asking if he was going to be okay and whether he was going to die. Once the emergency medical technicians stabilized Gomez in the ambulance, Kietlinski asked Gomez if he knew who shot him and Gomez responded that it was defendant. We reject defendant's argument that the statement was not an excited utterance because the statement was made in response to a question. Kietlinski's question could not have mitigated the stress associated with a gunshot wound. In our view, Supreme Court properly ruled that Gomez's statement, made within, at most, 30 minutes after Gomez had been shot, while he was in pain and wondering whether he would survive, was an admissible excited utterance (see People v Cotto, 92 NY2d 68, 79 [1998]; People v Brooks, 71 NY2d 877, 878 [1988], lv dismissed 74 NY2d 806 [1989]; People v Brown, 70 NY2d 513, 520 [1987]).
Next, defendant contends that Supreme Court erred in permitting Allen to testify that he knew defendant because he purchased drugs from him in the past. Generally, "evidence of a defendant's uncharged crimes or prior misconduct is not admissible if it cannot logically be connected to some specific material issue in the case, and tends only to demonstrate the defendant's propensity to commit the crime charged" (People v Cass, 18 NY3d 553, 559 [2012]; see People v Leonard, 29 NY3d 1, 6-7 [2017]). However, evidence of prior uncharged crimes may be admissible where it "provide[s] necessary background information regarding the nature of [the] defendant's relationship with the victim . . . and place[s] the charged conduct in context" (People v Ramsaran, 154 AD3d 1051, 1054 [2017] [internal quotation marks and citation omitted], lv denied 30 NY3d 1063 [2017]). Prior to trial, the court ruled that the People could question Allen about how he knew defendant, but not about the number of sales or the type of drugs involved. Allen testified that he first met defendant in July or August 2012 when defendant brought "some drugs" to a girl that he was with and met him "five or six times more after that." We agree with Supreme Court that Allen's testimony that he knew defendant through prior drug sales was admissible because it explained why defendant chose to confide in him (see People v Wells, 141 AD3d 1013, 1019-1020 [2016], lvs denied 28 NY3d 1183, 1189 [2017]). Defendant's argument that Supreme Court should not have allowed Allen to testify about the number of times they met is not preserved for our review.
Finally, defendant maintains that Supreme Court erred in giving a missing witness charge with respect to his failure to call Michaud as a witness. Defendant further contends that the court erred in refusing to read Michaud's testimony from the first trial into [*3]evidence pursuant to CPL 670.10. A missing witness charge "allows a jury to draw an unfavorable inference based on a party's failure to call a witness who would normally be expected to support that party's version of events" (People v Savinon, 100 NY2d 192, 196 [2003]). "To warrant a missing witness charge, the proponent of the charge must establish that (1) the witness's knowledge is material to the trial; (2) the witness is expected to give noncumulative testimony; (3) the witness is under the control of the party against whom the charge is sought, so that the witness would be expected to testify in that party's favor; and (4) the witness is available to that party" (People v Brown, 139 AD3d 1178, 1179 [2016] [internal quotation marks and citations omitted]; see People v Savinon, 100 NY2d at 197). Whether a witness can be expected to testify favorably is "the 'control' element, which requires the court to evaluate the relationship between the witness and the party to whom the witness is expected to be faithful" (People v Savinon, 100 NY2d at 197).
The record shows that the police arrived at the scene of the shooting around 9:45 p.m. As such, defendant's own testimony that he chose to seek refuge at Michaud's apartment shortly after 9:00 p.m. demonstrated that Michaud was knowledgeable about a material issue and would be expected to provide noncumulative testimony as to defendant's whereabouts at the time of the incident (see People v Gonzalez, 68 NY2d 424, 430 [1986]). Notably, the People called Michaud as a witness at the first trial, and subpoenaed her to testify and included her on their witness list for the retrial. The People also met with Michaud prior to the retrial and determined not to call her as a witness since she warned that "no matter what question [the People] posed . . . her answer would be 'I don't know.'" For his part, defendant maintains that he relied on the People's representation that Michaud would be called as a witness. He also contends that he only made the decision to testify during the trial, and thereafter exercised due diligence in trying to procure Michaud's testimony. That Michaud was identified as a potential witness for the People indicates that she may have been available to the People, but "the availability of a witness is a separate and distinct consideration from that of control" (People v Keen, 94 NY2d 553, 540 [2000] [internal quotation marks and citation omitted]). In our view, defendant's reliance on the People to call Michaud as a witness was misplaced for defendant was obligated to prepare his own defense.
Apart from Michaud's testimony in the first trial, it is fair to conclude from defendant's testimony that Michaud was under defendant's control as one could reasonably expect her to validate his alibi testimony as to his presence at her apartment. The nuance here, however, is that she testified under oath at the first trial that she did not know what time defendant actually arrived. The material issue, in our view, was not whether defendant stayed at Michaud's apartment, but whether he arrived prior to 9:45 p.m. As Michaud was uncertain on this key point, it is also difficult to characterize her expected testimony at the retrial as favorable to defendant or, even for that matter, to the People. This is particularly so given her expressed position that she would answer any question by asserting "I don't know" — a response that is actually consistent with her trial testimony. As such, we cannot say that the People met their burden of establishing either the knowledge or control elements of the missing witness charge, leading us to conclude that Supreme Court abused its discretion in reading the charge to the jury (see People v Savinon, 100 NY2d at 197). We find no error, however, in the court's denial of defendant's CPL 670.10 motion for his failure to show "due diligence in an effort to secure the attendance of a witness." Defendant was obligated to prepare his own defense and certainly had ample opportunity between trials to timely subpoena Michaud. Notwithstanding the missing witness charge error, given the abundant evidence identifying defendant as the shooter, we conclude that there is no significant probability that the jury would have acquitted defendant if it [*4]had not been given this charge. We therefore deem Supreme Court's error harmless (see People v Crimmins, 36 NY2d 230, 242 [1975]; People v Keen, 252 AD2d at 283).
Garry, P.J., Devine, Aarons and Pritzker, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: At least two of these children were under the age of 17 at the time of the incident for purposes of the charge of endangering the welfare of a child (see Penal Law § 260.10 [1]).