People v Ortiz (2025 NY Slip Op 50756(U))

[*1]

People v Ortiz

2025 NY Slip Op 50756(U)

Decided on May 8, 2025

County Court, Albany County

Little, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 8, 2025
County Court, Albany County

The People of the State of New York,

against
Xavier Ortiz, Defendant.

Indictment No. IND-71536-24/001

For the People:
Hon. Lee Kindlon
Albany County District Attorney
By: Stephen Lydon, Esq.
Albany County Judicial Center
Albany, New York 12207
For the Defendant:
Hon. Stephen W. Herrick
Albany County Public Defender
By: Jonathan Stroble, Esq.
112 State Street, Suite 200
Albany, New York 12207

William T. Little, J.

On December 20, 2024 the Court held a Huntley/Mapp/Dunaway hearing pursuant to the Decision and Order, dated November 29, 2024. The Court reserved decision and now, based on the following findings of fact and legal conclusions, denies the defendant's motion.
At the hearing, the People called eight witnesses; Albany Police Department (APD) Detective Anthony Fasciglione, APD Detective Sergeant Gregory Mulligan, APD Officer Cody Haack, APD Detective Ryan Johnson, APD Detective Mark Elliot, APD Detective Mark Dibble, Detective Arber Dragoj and APD Detective Bryan Roche. Each of these witnesses appeared frank and candid and the Court finds that their testimony had the force and flavor of credibility. The People also introduced nine exhibits. The Court further finds the exhibits to be reliable, authentic and worthy of consideration. The defendant did not call any witnesses and did not introduce any evidence.
The testimony at the hearing revealed that on the night of May 15, 2025, Haack, Roche and Mulligan were at the police station reviewing live city camera footage at the intersection of Grand Street and Madison Avenue in the City of Albany after being tasked with same due to a [*2]prior shooting in this area. Haack testified that while watching this footage, he observed two men walking back and forth from a silver SUV, interacting with other individuals on the street for a short period of time and "conducting hand-to-hand interactions" (GJ Transcript at p. 28). He stated that he observed one of the individuals, later identified as the defendant, as "kind of blocking street view of other people walking by," behavior he found to be consistent with that person looking out for the other. Haack further testified that he observed the individuals "sticking their hands into their pants, removing something, passing it" and then parting ways with the other individuals (GJ Transcript at p. 28). When asked to clarify who Haack observed doing the "hand-to-hand" transactions, he responded that he observed the defendant acting as a look out and the other individual as the one sticking his hands in his pants. Mulligan testified to same, identifying the defendant as the person he observed in the live camera footage standing in close proximity to the other individual that was performing the hand-to-hands and appeared to be looking out for law enforcement and working in tandem with the other individual.
Thereafter, based on the observations from the live camera footage, Haack and other patrol officers responded to the intersection and approached the silver SUV. Haack testified that he observed defendant standing on the passenger's side of the vehicle while the other individual sat in the front passenger's seat of the vehicle, facing the sidewalk with the passenger door open. Haack stated that during his approach, he observed the other individual engaging in "deferred movements" with "his hands moving potentially throwing things" (Grand Jury Transcript at p. 31). Haack testified that he "immediately" detained the defendant while other officers detained the other individual who was inside the vehicle (Grand Jury Transcript at p. 31). After the defendant was placed into handcuffs, Haack testified that he began searching the defendant's pockets where he removed US currency.
Elliot testified that while his fellow officers were detaining the two individuals, he "kind of swept to ensure that there was no one else inside of the vehicle" and observed a digital scale on the floorboard of the driver's side (Grand Jury Transcript at p. 57). Elliot then walked around the vehicle to the front passenger side to alert Dibble of same. Dibble then inquired whether there appeared to be drug residue on the scale. As Elliot began walking back to the driver's side of the vehicle, Dibble then relayed to Elliot that "we are good" to search the vehicle. Dibble testified that this message was relayed based on his observation of a small piece of white, chunky substance that appeared to be crack cocaine when he was looking into the front right passenger side of the vehicle.
As a further search of the vehicle was being conducted, a handgun was located in the glove compartment as well as other quantities of suspected crack cocaine. At that point, the defendant was being walked over to a police vehicle and while passing his vehicle, stated "that is mine" and "the pistol is mine" (Grand Jury Transcript at p. 84). After the defendant was transported to the police station, the defendant revealed that he had concealed narcotics on his person and following a strip search of the defendant, a plastic bag with suspected narcotics was recovered.
Initially, the Court will turn its attention to the Dunaway portion of the hearing. At a Dunaway hearing, the People bear the burden of demonstrating that the police conduct was lawful, while the defendant bears the ultimate burden of proving by a preponderance of the evidence that suppression is warranted (see People v Berrios, 28 NY2d 361, 367 [1971]). Here, the police conducted a warrantless search of both the defendant's person and his vehicle. Warrantless searches and seizures are presumptively unreasonable, and the burden is on the [*3]prosecution to demonstrate that there is a legitimate exception to the general requirement of a search warrant (see People v Crosse, 197 AD3d 792, 795 [3d Dept 2021]; People v Jimenez, 22 NY3d 717, 721 [2014]). The defendant bears the ultimate burden of showing by a preponderance of the evidence that suppression of the evidence is warranted (People v. Berrios, 28 NY2d 361,367 [1971]; Mapp v. Ohio, 367 US 643 [1961]; People v. Malinsky, 15 NY2d 86, 91 [1965]).
Here, defendant contends that the police conduct was unlawful inasmuch as the police "almost immediately escalated the encounter [with the defendant] from detention to an arrest requiring probable cause." In contrast, the People contend that although the police could not see what specific items were exchanged by the defendant and the other individual, the officer testimony established that the individuals were engaged in hand-to-hand narcotics transactions based on their training and experience. The People point to Haack's testimony where he states he observed via the street camera surveillance both individuals "going back and forth" from their vehicle, "sticking their hands into the pants, removing something, passing it" and then going separate ways from the purchasers of the narcotics (Grand Jury Testimony at p. 28). The People further contend that on these observations, coupled with the notoriety of the subject area as a "drug probe" area based on the officers' experience, establish that police had probable cause.
It is well settled that, "[b]efore a person may be stopped in a public place a police officer must have reasonable suspicion that such person is committing, has committed, or is about to commit a crime" (People v Messano, 41 NY3d 228, 232 [2024] [internal quotation marks and citation omitted]). "Reasonable suspicion is that quantum of knowledge sufficient to induce an ordinarily prudent and cautious person under the circumstances to believe criminal activity is at hand" (id. [internal quotation marks and citations omitted]). In this matter, the totality of the circumstances establish that the police had reasonable suspicion that defendant was engaged in a drug transaction (see People v Tapia, 230 AD3d 1009, 1011 [1st Dept 2024], lv granted 42 NY3d 1070 [2025]).
Here, the "telltale signs of a drug transaction" were readily apparent based on the hearing testimony including, the observation of hand-to-hand transactions, the area being known to officers as an area "prevalent for selling and distributing crack cocaine[,]" the officer's training and experience, the observations of the individuals removing something from their pants and passing it off, their short approaches with other individuals, as well as the observation of the "deferred movements" of the second individual at the scene (People v Tapia, 230 AD3d at 1010; see People v Jones, 90 NY2d 835, 837 [1997]). Although the police did not testify that they actually observed the exchange of illicit drugs and money, "police officers may also draw logical inferences from [specific and articulable] facts" (People v Zubidi, 233 AD3d 55, 59 [1st Dept 2024], lv granted 42 NY3d 1043 [2024]; compare People v Messano, 41 NY3d at 234-235 [holding that police lacked reasonable suspicion when they "believed" they observed hand to hand transactions, without any other record evidence to support the same]). Accordingly, the Court finds that the police had a reasonable suspicion that the defendant was engaged in criminal activity, justifying their stop and detaining of the defendant (see People v Graham, 233 AD3d 1361, 1366 [3d Dept 2024], lv denied  NY3d , , 2025 WL 1155936 [2025]). 
Turning next to the police search of the defendant's vehicle, the defendant contends that the police conducted a warrantless search of defendant's car without probable cause. To this end, defendant notes that the police search of the vehicle was based on an officer's observations only after "breaking the threshold" of what could be identified by the naked eye. The People contend [*4]that the police properly seized evidence without a warrant based on the plain view doctrine.
Here, as the Court has already concluded that the police were justified in their actions based on the reasonable suspicion that the defendant had engaged in illicit drug sales, the question turns next to whether the police had a lawful vantage point when they observed what they contest was in plain view (see People v Messano, 41 NY3d at 234).
It is well established that warrantless searches and seizures are per se unreasonable (see People v Messano, 41 NY3d at 232). However, "law enforcement officers may properly seize an item in plain view without a warrant if . . . they are lawfully in a position to observe the item" (People v Messano, 41 NY3d at 233 [internal quotation marks and citation omitted]). "Under the plain view doctrine, if the sight of an object gives the police probable cause to believe that it is the instrumentality of a crime, the object may be seized without a warrant if three conditions are met: (1) the police are lawfully in the position from which the object is viewed; (2) the police have lawful access to the object; and (3) the object's incriminating nature is immediately apparent" (People v Diaz, 81 NY2d 106, 110 [1993]; see People v Gibson, 117 AD3d 1317 [3d Dept 2014], lv denied 24 NY3d 1125 [2015]). To this end, "a truly cursory inspection—one that involves merely looking at what is already exposed to view, without disturbing it—is not a 'search' for Fourth Amendment purposes" (Arizona v Hicks, 480 US 321, 328 [1987]).
Both the testimony and the body worn camera footage demonstrates that the front passenger door was open, and remained open, prior to the police involvement with the defendant and the other individual.[FN1]
 Accordingly, the question for the Court is whether the white powdery substance viewed from the vantage point of an open front passenger door and the digital scale viewed from the vantage point of the closed, front driver side was within "plain view." Here, the police were lawfully in a position to view the vehicle as they were properly stopping the defendant and seizing him from the passenger seat of the vehicle (see supra p. 3-4). To this end, the passenger side door of the vehicle was already open upon police arrival, leaving the police free to conduct a "cursory inspection" of inside the vehicle from that vantage point. As such, Dibble's observation of crack cocaine in between the passenger's seat and the passenger's door from this vantage point was justification for the police to then conduct a search of the vehicle without a warrant as the incriminating nature of the crack cocaine was readily apparent (compare People v Mosquito, 197 AD3d 504, 509 [2d Dept 2021]; see Arizona v Hicks, 480 US at 328).[FN2]
Elliot's observation of the digital scale from outside of the closed passenger door was similarly from a lawful vantage point, however, the Court need not address whether the "incriminating nature" of the digital scale, without an observation of drug residue, was readily apparent as Dibble observation of the crack cocaine ultimately informed the police decision to authorize a complete search of the vehicle. As an additional note, neither Elliot's nor Dibble's shining of a flashlight into the vehicle rendered their actions "unreasonable intrusion[s]" (People v Merritt, [*5]96 AD3d 1169, 1170 [3d Dept 2012], lv denied 19 NY3d 1027 [2012]; see People v Fells, 279 AD2d 706, 709-710 [3d Dept 2001], lv denied 96 NY2d 758 [2001]).
Finally, this Court turns its attention to the Huntley portion of this hearing. It is well settled that at a Huntley hearing, the People bear the burden of proving beyond a reasonable doubt that a defendant's statement was voluntarily given — including proof that any custodial questioning was preceded by a knowing and voluntary waiver of his or her Miranda rights (see People v Bermudez, 217 AD3d 1261, 1263 [3d Dept 2023], lv denied 40 NY3d 996 [2023]). In contrast, a defendant bears the ultimate burden of establishing a violation of the right to counsel (see People v Brown, 46 AD3d 1128, 1129 [3d Dept 2007]; People v Mathis, 147 AD2d 851, 852 [3d Dept 1989], lv denied 73 NY2d 1018 [1989]).
In this case, the People offered body worn camera footage of Haack and Dragoj, as well as video footage of the defendant's interview at the police station. The body worn camera footage from Haack demonstrates that while the defendant was handcuffed and initially being pat down by Haack, the defendant inquired if he was "under investigation" and the police responded that he was, for selling narcotics. After the defendant denied this activity, he notified police that he did not give his consent for police to search him or his vehicle. While Dragoj was leading the defendant to a police vehicle, a handgun was found in the defendant's vehicle and the same was announced to fellow officers. The defendant then claimed the handgun as his and, after a clarifying question by Dragoj if the pistol was his, the defendant answered affirmatively and denied having a permit for same. The defendant stated that he found the pistol on the street "a couple of days ago." Before entering the police vehicle, the defendant then again claimed ownership of the pistol stating, "the pistol is mine." While in the police vehicle, the defendant reiterated the ownership of "everything in that car."
The video evidence demonstrates that the defendant was not interrogated at any point during this time and that although the defendant was in custody at the time that his statements were made, all statements were genuinely spontaneous "and not the product of questioning or its functional equivalent" (People v Davis, 204 AD3d 1072, 1078 [3d Dept 2022], lv denied 38 NY3d 1032 [2022]). Moreover, Draoj's follow-up inquiry to defendant's spontaneous statement "was merely intended to clarify defendant's spontaneous statement which immediately preceded it, and did not constitute a custodial interrogation" (People v Davis, 155 AD3d 1311, 1315 [3d Dept 2017], lv denied 30 NY3d 1114 [2018]). Accordingly, they are not subject to suppression.
The body worn camera footage from Haack demonstrates that while the defendant sat in the police vehicle and was awaiting his transport to the police station, the questioning by the police went to pedigree information only. This booking or biographical information is not subject to suppression, as the questions posed were routine and related to administrative concerns (see People v Reichel, 211 AD3d 1090, 1091-1092 [3d Dept 2022], lv denied 39 NY3d 1113 [2022]; People v Callicut, 101 AD3d 1256, 1264 [3d Dept 2012], lv denied 20 NY3d 1096 [2013]). Similarly not subject to suppression are defendant's statements that he made while walking into the police station regarding the narcotics he had on his person. These statements were genuinely spontaneous "and not the product of questioning or its functional equivalent" (People v Davis, 204 AD3d at 1078).
Lastly as it relates to the interview of the defendant, the recorded interview establishes that the defendant was properly read his Miranda rights, understood these rights and freely and voluntarily waived these rights without coercion (see People v Erfurt, 234 AD3d 1120, 1123 [3d Dept 2025]; People v Bermudez, 217 AD3d at 1263).
The above constitutes the Decision and Order of the Court. The parties are directed to appear for pre-trial hearings (Sandoval/ Molineux/Ventimiglia) at a later time to be decided by the Court.
Dated: May 8, 2025
Albany, New York
HON. WILLIAM T. LITTLE
COUNTY COURT JUDGE

Footnotes

Footnote 1:The body worn camera footage further reveals that upon detaining the defendant and the other individual, an officer opened the back left door of the vehicle to see if there were any other passengers in the vehicle. This door remained open; however, no evidence was found from that vantage point until after police authorized a full search of the vehicle.

Footnote 2:Although the body worn camera footage of Haack and Elliot reveals that Dibble was leaning into the vehicle during his cursory search, the Court has determined this does not render him as "entering" the vehicle (compare People v Bishop, 11 AD3d 1034, 1035 [4th Dept 2004]).